UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

RHONDA SUE DUBOIS                 CIVIL ACTION NO. 6:15-cv-02184

VERSUS                            MAGISTRATE JUDGE HANNA

U.S. COMMISSIONER,                BY CONSENT OF THE PARTIES
SOCIAL SECURITY
ADMINISTRATION

## MEMORANDUM RULING

Before the Court is an appeal of the Commissioner's finding of non-disability.

In accordance with the provisions of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the

parties consented to have this matter resolved by the undersigned Magistrate Judge.

(Rec. Doc. 12).  Considering the administrative record, the parties' briefs, and the

applicable law, the Commissioner's decision is reversed, and benefits are awarded.

### ADMINISTRATIVE PROCEEDINGS

The claimant, Rhonda Sue Dubois, fully exhausted her administrative remedies

prior to filing this action.  The claimant filed applications for disability insurance

benefits ("DIB") and for supplemental security income benefits ("SSI"), alleging

disability beginning on May 1, 2009.[1]  Her applications were initially granted[2] but

---

[1]      Rec. Doc. 7-1 at 237, 239.

[2]      Rec. Doc. 7-1 at 80, 99.

then denied.[3]  The claimant requested a hearing, which was held on June 5, 2012 before Administrative Law Judge Lawrence T. Ragona.[4]  The ALJ issued a decision on June 26, 2012,[5] concluding that the claimant was not disabled within the meaning of the Social Security Act through the date of the decision.  The Appeals Council vacated the ruling and remanded the case to the ALJ for further consideration.[6]  More particularly, the Appeals Council ordered an evaluation of new evidence from the claimant's treating psychiatrist, Dr. Lindsay Legnon, a more comprehensive discussion of the impact of the claimant's mental limitations on her residual functional capacity, and an evaluation of the opinions of the state agency medical consultant, Dr. Cathy Castille.  A second hearing was held on February 19, 2014 before the same ALJ.[7]  The ALJ issued his second decision on May 13, 2014, again concluding that the claimant was not disabled from May 1, 2009 through the date of the decision.[8]  Therefore, the ALJ's decision became the final decision of the

---

[3]     Rec. Doc. 7-1 at 59, 69.

[4]     The hearing transcript is found at Rec. Doc. 7-1 at 5-19.

[5]     Rec. Doc. 7-1 at 103.

[6]     Rec. Doc. 7-1 at 116-118.

[7]     The hearing transcript is found at Rec. Doc. 7-1 at 37-58.

[8]     Rec. Doc. 7-1 at 18-29.

-2-

Commissioner for the purpose of the court's review pursuant to 42 U.S.C. § 405(g).

The claimant then filed this action seeking review of the Commissioner's decision.

## SUMMARY OF PERTINENT FACTS

The claimant, Rhonda Sue Dubois, was born on October 29, 1969.[9] At the time

of the ALJ's decision, she was forty-four years old. She graduated from high school

but had no vocational training or formal education thereafter.[10] She has past relevant

work experience as a parts technician for an air conditioning and heating business,

as a waitress in a pizza restaurant, and as a receptionist and file clerk.[11] She alleges

that she has been disabled since May 1, 2009 due to mental illness.[12]

The claimant has treated at the Tyler Mental Health Center since December 28,

2009. On that date, she was diagnosed by psychiatrist Dr. Lindsay Legnon with

Major Depressive Disorder, Single Episode, Moderate, and Generalized Anxiety

Disorder.[13] That diagnosis was later changed to Bipolar Disorder, NOS, and

Generalized Anxiety Disorder.[14] The claimant has seen Dr. Legnon approximately

---

[9]     Rec. Doc. 7-1 at 6, 38, 237, 239.

[10]    Rec. Doc. 7-1 at 8, 40.

[11]    Rec. Doc. 7-1 at 8-9, 40-41, 292.

[12]    Rec. Doc. 7-1 at 70, 239.

[13]    Rec. Doc. 7-1 at 410-413.

[14]    Rec. Doc. 7-1 at 385.

-3-

once each month since that initial visit.  She has also seen a mental health therapist or counselor at the Tyler Center approximately once a month.

During the initial evaluation, the claimant was described as nervous, stressed, and crying.  She explained feelings of helplessness, worthlessness, and hopelessness, and complained of worrying that had worsened since the birth of her handicapped child.  At that time, she had a three-year-old son with autism who required constant attention, as well as older children aged twenty-two and eleven.  She indicated that she had had no friends since the birth of her youngest child.  She described frequent crying spells, poor sleep, weight gain, fatigue, and recent suicidal ideation.  She also told Dr. Legnon that she needs to keep things in order and very clean.  Dr. Legnon assigned a GAF score of 55, indicating moderate symptoms.[15]  Following the initial evaluation, counseling and medication were started.  Dr. Legnon prescribed Sertraline for depression and anxiety and Vistaril for anxiety and insomnia.[16]

On March 24, 2010,[17] the claimant again saw Dr. Legnon.  She reported only minimal improvement in her symptoms although her suicidal ideation had resolved and she had experienced a decrease in obsessional cleaning behavior.  She was not

---

[15]     Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM–IV") at 32.

[16]     Rec. Doc. 7-1 at 447.

[17]     Rec. Doc. 7-1 at 432.

taking three showers per day any more and was only mopping her house three times per week rather than three times per day.  Her medication was adjusted.

Dr. Legnon saw the claimant again on April 14, 2010.[18]  The claimant reported an increase in agitation, depression, racing thoughts, distractibility, and anxiety with the recent increase in her Zoloft prescription.  Dr. Legnon decided to taper off the Zoloft and prescribe Depakote in its place.

The claimant next saw Dr. Legnon on May 5, 2010.[19]  She described racing thoughts, increased speech, irritability, and mood swings.  Her mood was not good, and her affect was labile or emotionally unstable.  Her Depakote dosage was increased.  Dr. Legnon noted that her diagnosis was now Bipolar Disorder, NOS and Generalized Anxiety Disorder.

On May 19, 2010,[20] the claimant told Dr. Legnon that her depression was better but she was continuing to have trouble sleeping, she felt as though her mind and body were racing, and she continued to have symptoms of obsessive-compulsive disorder centered on obsessive cleanliness such as showering three times each day.

---

[18]      Rec. Doc. 7-1 at 431.

[19]      Rec. Doc. 7-1 at 427.

[20]      Rec. Doc. 7-1 at 425.

-5-

On June 18, 2010,[21] the claimant told Dr. Legnon she had been doing "fairly well" until about two weeks earlier when she became irritable, angry, and easily overwhelmed with crying spells.  She stated that she took only one dose of Geodon because it made her feel "terrible."  She was continuing to take Depakote, and Abilify was added for mood symptoms.

On July 21, 2010,[22] Dr. Legnon noted that the claimant was unable to take Abilify because it made her dizzy.  The claimant had also reduced the dosage of Depakote because she felt it was making her symptoms worse.  She reported irritability, crying spells, and racing thoughts.  Her mood was dysphoric, and her affect was labile.  Dr. Legnon prescribed Tegretol.

On August 4, 2010,[23] the claimant denied any improvement with Tegretol, and she reported that she was feeling more depressed.  However, her racing thoughts had decreased and she was sleeping slightly better.  She also described feeling overwhelmed easily.  Her Tegretol prescription was increased, and a short term trial of Clonazepam was prescribed.

---

[21]    Rec. Doc. 7-1 at 423.

[22]    Rec. Doc. 7-1 at 421.

[23]    Rec. Doc. 7-1 at 420.

The claimant next saw Dr. Legnon on September 16, 2010.[24]  She noted some improvement in her mood since starting Tegretol but was unable to tolerate its sedating effects.  Her crying spells had also started again.  Dr. Legnon decided to discontinue the Tegretol due to oversedation and prescribed Trileptal instead.

The claimant's next appointment with Dr. Legnon was on November 9, 2010.[25] The claimant reported that she was doing much better with the Trileptal and denied feeling excessively up or down.  However, she also described panic attacks and reported that she was avoiding certain places during busy hours because she did not want to be around people due to her anxiety.

On December 8, 2010,[26] the claimant was reevaluated by a therapist at the Tyler Mental Health Center, social worker Cristy James.  She was again diagnosed with Major Depressive Disorder, Single Episode, Moderate and Generalized Anxiety Disorder.  The claimant reported to the counselor that she had been doing well despite having several stressors including financial concerns and being the sole caregiver for her two minor children, one of whom has autism.  The claimant also reported that she is a caretaker for her parents.  At that time, the claimant was taking both Trileptal and

---

[24]     Rec. Doc. 7-1 at 419.

[25]     Rec. Doc. 7-1 at 418.

[26]     Rec. Doc. 7-1 at 370, 408-409, 417.

Paxil.  She reported that the Paxil helps her with being in crowds.  But she was still taking three showers per day.

Dr. Legnon saw the claimant again on January 21, 2011.[27]  The claimant reported that she was doing well and that the Paxil had helped significantly with reducing social anxiety and obsessional cleaning.  Her worry had decreased, and she was functioning at a higher level.

Dr. Legnon's handwritten notes from January 24, 2011 and February 25, 2011 are largely illegible; however, it appears that Seroquel was prescribed and the Paxil dosage was adjusted.[28]

The claimant again saw Dr. Legnon on July 12, 2011.[29] The claimant described mood lability, racing thoughts, irritability, and anger.  Although she initially reported her mood as good, she later acknowledged that she was feeling depressed and anxious.  Her affect was labile, and her thought processes were tangential at times. Dr. Legnon decided to titrate up the Seroquel dosage.  On that same date, Dr. Legnon

---

[27]    Rec. Doc. 7-1 at 416.

[28]    Rec. Doc. 7-1 at 415, 414, respectively.

[29]    Rec. Doc. 7-1 at 385.

changed the claimant's diagnosis to Bipolar Disorder, NOS, and Generalized Anxiety Disorder, and she assigned a GAF score of 50,[30] which indicates serious symptoms.[31]

On August 9, 2011, the claimant was seen again by Dr. Legnon.[32]  The claimant reported very poor sleep, slightly improved depression with fewer crying spells, but increased energy, irritability, some impulsivity, and racing thoughts.  She stated that she avoids people because she does not want to be ugly to them.  She identified chronic joint pain, hernia pain, and her autistic son as stressors.  Dr. Legnon noted that the claimant's excessive worry continues.  Her mood was irritable, her affect was labile, and she was tearful.  Her medication dosages were adjusted, Trileptal was discontinued, and Lamictal was started.

On September 7, 2011,[33] the claimant told social worker James that she is unable to control her impulsive verbal expressions to others and explained that when she has a thought, she expresses it, regardless of how harmful or hurtful it may be to another person, admitting that "I have no filter."

---

[30]     Rec. Doc. 7-1 at 386.

[31]     DSM–IV at 32.

[32]     Rec. Doc. 7-1 at 465.

[33]     Rec. Doc. 7-1 at 464.

Dr. Legnon saw the claimant again on September 21, 2011.[34]  The claimant reported panic attacks, an inability to tolerate Lamictal, and side effects of oversedation from Seroquel.  She reported that she was still very irritable with racing thoughts and saying things that she later regrets.  Her medications were again adjusted, by discontinuing Paxil and starting Clonazepam, and changing the dosage of Lamictal.

The claimant returned to Dr. Legnon on October 18, 2011,[35] reporting that she felt like she was "back to square one."  She described increased irritability, not sleeping well, and saying things that she feels bad about later.  Her mood was aggravated, her affect was congruent with her mood, and she was tearful.  Dr. Legnon decided to restart Paxil, discontinue Clonazepam, add a low dose of Seroquel, and increase the dosage of Lamictal.

On November 11, 2011, the claimant returned to Dr. Legnon.[36]  She reported that she was unable to tolerate the increased dosage of Seroquel due to sedation.  The Paxil made no difference in her anxiety or panic attacks.  Her mood was not good, her

---

[34]     Rec. Doc. 7-1 at 463.

[35]     Rec. Doc. 7-1 at 462.

[36]     Rec. Doc. 7-1 at 461.

affect was tearful, she reported being very irritable and wanting to strangle people other than her children.  Her medications were again adjusted.

On February 2, 2012, the claimant was again seen by Dr. Legnon.[37]  The claimant reported some reduction in irritability and mood but also reported the onset of visual and auditory hallucinations.  Her mood was not too good, her affect was anxious.  Her medications were adjusted again.

On March 1, 2012,[38] Dr. Legnon noted that the Seroquel would be discontinued because it may have been causing psychosis and because it was ineffective for the claimant's mood disorder.  Risperdal was to be tried instead.  The patient reported irritability such that she avoids people in order to prevent herself from saying something mean to them.

On April 4, 2012,[39] Dr. Legnon again saw the claimant.  The claimant reported that the change from Seroquel to Risperdal did not result in any improvement, that her sleep had worsened, and that her appetite had increased.  She reported continued mood swings, especially sadness as well as problematic irritability.  She was tearful, her mood was labile, her affect was dysphoric, and her thought processes were

---

[37]     Rec. Doc. 7-1 at 460.

[38]     Rec. Doc. 7-1 at 452.

[39]     Rec. Doc. 7-1 at 451.

organized but occasionally tangential.  Dr. Legnon discontinued the Risperdal due to the claimant's rapid weight gain, prescribed Abilify for mood stabilization, adjusted the Trileptal dose, and continued the Paxil.

On May 4, 2012,[40] Dr. Legnon noted that the claimant had broken out into a rash after taking Abilify and also felt hung over after taking it.  However, she was feeling more calm.  The Abilify was discontinued, and Saphris was started.  On May 9, 2012, however, Dr. Legnon noted that the Saphris induced vomiting, so the medications were again adjusted.[41]

On June 5, 2012, the claimant testified at a hearing before ALJ Lawrence T. Ragona.  She explained that she has a bipolar disorder, anxiety, and a sleep disorder, which results in her crying a lot.[42]  She stated that caring for her autistic child is a challenge.[43]  She testified that she assists her disabled parents.[44]  She stated that her moods change frequently.[45]  She explained that the main reason she stopped working

---

[40]     Rec. Doc. 7-1 at 459.

[41]     Rec. Doc. 7-1 at 459.

[42]     Rec. Doc. 7-2 at 9.

[43]     Rec. Doc. 7-2 at 10.

[44]     Rec. Doc. 7-2 at 10.

[45]     Rec. Doc. 7-2 at 12.

was because of stress.[46]  She also stated that she has frequent panic attacks as often as three times per day,[47] sleeps only about four hours per night,[48] and engages in no social activities.[49]

The claimant saw Dr. Legnon again on June 26, 2012.[50]  She reported that she had been sleeping poorly, had high anxiety, experienced several panic attacks each day, and was agitated and irritable.  She was unable to begin Zyprexa because it was not available.

The claimant saw Dr. Legnon again on July 23, 2012.[51]  After consulting with another doctor, Dr. Legnon decided to discontinue the Trileptal and return to Depakote.

On July 27, 2012,[52] the claimant was tearful from the beginning of the appointment, stated that she was sleeping very little, and reported agitation and

---

[46]     Rec. Doc. 7-2 at 13.

[47]     Rec. Doc. 7-2 at 14.

[48]     Rec. Doc. 7-2 at 15.

[49]     Rec. Doc. 7-2 at 14

[50]     Rec. Doc. 7-1 at 526.

[51]     Rec. Doc. 7-1 at 525.

[52]     Rec. Doc. 7-1 at 523-524.

irritability.  Dr. Legnon noted that her symptoms were marked and, with regard to global improvement, noted that the claimant was "minimally worse."

Dr. Legnon saw the claimant again on August 21, 2012[53] and again noted that her symptoms were marked and had not improved.  At this appointment, the claimant was feeling very irritable and said she had difficulty waiting in the waiting room.  Her moods were described as up and down, her sleep was reported to be poor, and she had lost her Klonopin prescription while moving.  The rash from the Zyprexa was still resolving.  She exhibited a dysphoric, irritable mood, her affect was tearful and labile, and her pace was faster than usual.

On that same date, August 21, 2012, Dr. Legnon wrote a letter[54] in which she noted that she had been the claimant's treating psychiatrist since December 28, 2009. She stated that the claimant has been diagnosed with Bipolar Disorder Not Otherwise Specified and Generalized Anxiety Disorder and, although the claimant was compliant with prescribed medications and counseling sessions, she had not reached stability.  Dr. Legnon noted that the claimant is easily overwhelmed by small matters and has a low stress tolerance in general.  She has difficulty being around others and has had trouble waiting in the waiting area at Dr. Legnon's office.  The claimant is

---

[53]      Rec. Doc. 7-1 at 519-520.

[54]      Rec. Doc. 7-1 at 479.

-14-

often embarrassed by her impulsive verbal remarks.  Dr. Legnon opined that, because of the severity and persistence of her psychiatric symptoms, the claimant will not be able to maintain employment.

On September 25, 2012, the claimant again saw Dr. Legnon.[55]  The claimant reported that she was angry and irritable the day before the appointment, happy the day before that, but depressed the day of the appointment.  Dr. Legnon described her mood as depressed, her affect as tearful, and the severity of her symptoms as marked. Her Depakote dosage was adjusted.

The claimant returned to see Dr. Legnon on October 23, 2012.[56]  Dr. Legnon noted that the claimant continued to describe mood instability.  Dr. Legnon described the claimant's affect as labile and tearful and described her mood as anxious.  She rated the severity of her symptoms as moderate but noted no change in global improvement.

At the appointment on December 4, 2012,[57] Dr. Legnon described the claimant as hyperactive, with a labile and tearful affect, and an anxious, irritable, depressed mood.  Dr. Legnon described the severity of her symptoms as marked.  The claimant

---

[55]     Rec. Doc. 7-1 at 516-517.

[56]     Rec. Doc. 7-1 at 513-514.

[57]     Rec. Doc. 7-1 at 511-512.

-15-

had difficulty staying in the waiting room, and described irritability, racing thoughts, low motivation, sadness, crying spells, and anger.  Dr. Legnon prescribed Ativan.

The claimant returned to see Dr. Legnon on February 27, 2013.[58]  Dr. Legnon again described the severity of her symptoms as marked.  The claimant reported that she was feeling very irritable.  She was unable to sit in the waiting room and reported that she isolates herself from others when she is irritable.  However, she stated that she is patient with her children.  She reported that the Ativan had helped her sleeping but she was forgetful and distracted.

The claimant's next visit with Dr. Legnon was on April 29, 2013.[59]  Dr. Legnon indicated that the severity of her symptoms was marked but minimally improved.  The claimant stated that the increased dose of Depakote helped to calm her down a little, but she reportedly remained very irritable and anxious but with fewer crying spells.

On May 10, 2013, the claimant reported to social worker Michelle Maloney that the symptoms of her obsessive-compulsive disorder were very active and she was cleaning and recleaning often.[60]

---

[58]     Rec. Doc. 7-1 at 509-510.

[59]     Rec. Doc. 7-1 at 504-505.

[60]     Rec. Doc. 7-1 at 501.

On June 7, 2013, the claimant again met with Ms. Maloney.[61]  The claimant rated her obsessive-compulsive disorder symptoms as a five on a scale of one to ten, and rated her depression with irritability, yelling, and crying also as a five.

On July 15, 2013,[62] Ms. Maloney noted that the claimant's mood was depressive but she "functions well."

On July 29, 2013, the claimant again saw Dr. Legnon.[63]  The claimant reported feeling very irritable and avoiding places where there are more than a few people. She reported difficulty tolerating the waiting area at Dr. Legnon's office.  Dr. Legnon noted that her affect was labile and tearful, her mood was irritable, the severity of her symptoms was marked, and her symptoms were minimally worse.

The claimant next saw Dr. Legnon on August 15, 2013.[64]  The claimant reported that, since discontinuing Depakote, her mood has worsened and she had experienced increased irritability, mood swings, and general impatience.  She reported that she avoids being around others.  Dr. Legnon described her mood as anxious, dysphoric, and irritable, and described her affect as labile.  Dr. Legnon noted

---

[61]     Rec. Doc. 7-1 at 499.

[62]     Rec. Doc. 7-1 at 498.

[63]     Rec. Doc. 7-1 at 496-497.

[64]     Rec. Doc. 7-1 at 492-493.

that the claimant's symptoms were markedly severe and minimally worse.   Dr. Legnon again adjusted the medication regimen.

On September 11, 2013, Dr. Legnon completed a mental functional capacity assessment.[65]  In five categories, Dr. Legnon found that the claimant had limitations that were likely to occur more than fifty percent of the work week, including the following:  perform activities within a schedule, and be punctual within customary tolerances;  work in coordination with or in proximity to others without being distracted by them; complete a normal work-day and work week without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;  accept instructions and respond appropriately to criticism from supervisors;  and get along with coworkers or peers without distracting them.  She also found that the claimant had limitations in two additional areas that would likely occur from 25% to 50% of the work week, i.e., maintain attention and concentration for two hour blocks of time and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  Dr. Legnon assigned a GAF score of 45, indicating serious symptoms.[66] Dr. Legnon also added handwritten comments to the assessment form, stating that the

---

[65]     Rec. Doc. 7-1 at 481-482.

[66]     DSM–IV at 32.

-18-

claimant "has been compliant with medications and psychotherapy appointments, however, neither have been very effective for her symptoms.  She is unable to handle even the smallest stressor and has difficulty being around people other than her immediate family.  She is easily overwhelmed and emotional.  I do not believe she would be able to maintain any form of employment."

On September 12, 2013,[67] the claimant told social worker Michelle Maloney that she was feeling overwhelmed and she cried through much of the session.  Her anxiety was high and she could not wait in the waiting area at the mental health center due to her great discomfort being around people.  Still, the claimaint reported that, with regard to daily functioning, she was managing "fairly well" due to her special needs son having returned to school, giving the claimant a couple of hours per day respite from his constant needs.  The claimant stated that she had not told anyone off in quite some time and, although tempted, she had not sprayed anyone with Clorox cleanser in public for a while.  She noted an increased tolerance for body odors and she noted an improvement characterized as leaving situations rather than overstepping personal boundaries or confronting people.

---

[67]      Rec. Doc. 7-1 at 490.

On October 8, 2013, the claimant again saw Dr. Legnon.[68]  Dr. Legnon described her affect as labile and tearful, described her mood as irritable and depressed, and noted that the claimant continued to have difficulty tolerating other people.  Her medication was again adjusted.

On October 9, 2013,[69] the claimant again reported to Ms. Maloney that she was leaving stores when other people's hygiene bothered her rather than spraying them with Clorox bleach.

On December 12, 2013,[70] the claimant reported to Dr. Legnon that her moods were up and down, that she cried easily, that she remained easily agitated, and that she avoided people as much as possible because they aggravate her.  Dr. Legnon described her as hyperactive, labile, irritable, and depressed.

On January 8, 2014, the claimant met with Ms. Maloney.[71]  She reported having had three panic attacks in the previous month.  Discussion centered on her lack of tolerance, anxiety, and constant worry.

---

[68]     Rec. Doc. 7-1 at 536-637.

[69]     Rec. Doc. 7-1 at 538.

[70]     Rec. Doc. 7-1 at 533-534.

[71]     Rec. Doc. 7-1 at 530.

At the second hearing, on February 19, 2014, the claimant testified that her constant worrying and lack of the ability to focus prevent her from working.[72]  She described her panic attacks, and explained that she cannot stand how people smell, so she sprays them with Clorox.[73]  She stated that she worries constantly and cleans constantly, taking as many as four showers per day.[74]  She testified that, despite three mental health appointments per month, she does not think her symptoms are improving.[75]  She stated that she carries soap, hand sanitizer, bath powder, Clorox, and Febreeze in her purse, and washes her hands approximately twenty times per day.[76]  She explained that the Tyler Mental Health Center tries to get her in and out of her appointments quickly because she has trouble tolerating the waiting room.[77]

### ANALYSIS

#### A.    THE STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the

---

[72]     Rec. Doc. 7-1 at 41.

[73]     Rec. Doc. 7-1 at 42.

[74]     Rec. Doc. 7-1 at 46.

[75]     Rec. Doc. 7-1 at 49.

[76]     Rec. Doc. 7-1 at 50.

[77]     Rec. Doc. 7-1 at 51-52.

proper legal standards were used in evaluating the evidence.[78]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[79]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[80]

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[81]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[82]  Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the

_____

[78]     *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[79]     *Villa v. Sullivan*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

[80]     *Hames v. Heckler*, 707 F.2d at 164 (quoting *Hemphill v. Weinberger*, 483 F.2d 1137. 1139 (5th Cir. 1973), and *Payne v. Weinberger*, 480 F.2d 1006, 1007 (5th Cir. 1973)).

[81]     42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

[82]     *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1021; *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Carey v. Apfel*, 230 F.3d at 135; *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

courts.[83]   Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:   (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[84]

## B.   ENTITLEMENT TO BENEFITS

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[85]  Every individual who meets certain income and resource requirements, has filed an application for benefits, and is determined to be disabled is eligible to receive Supplemental Security Income ("SSI") benefits.[86]

The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can

---

[83]    *Martinez v. Chater*, 64 F.3d at 174.

[84]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991); *Martinez v. Chater*, 64 F.3d at 174.

[85]    See 42 U.S.C. § 423(a).

[86]    42 U.S.C. § 1382(a)(1) & (2).

be expected to last for a continuous period of not less than twelve months."[87]   A

claimant shall be determined to be disabled only if his physical or mental impairment

or impairments are so severe that he is unable to not only do his previous work, but

cannot, considering his age, education, and work experience, participate in any other

kind of substantial gainful work which exists in significant numbers in the national

economy, regardless of whether such work exists in the area in which the claimant

lives, whether a specific job vacancy exists, or whether the claimant would be hired

if he applied for work.[88]

## C.   THE EVALUATION PROCESS AND THE BURDEN OF PROOF

The Commissioner uses a sequential five-step inquiry to determine whether a

claimant is disabled.  This process requires the ALJ to determine whether a claimant

(1) is currently working; (2) has a severe impairment; (3) has an impairment listed in

or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is

able to do the kind of work he did in the past; and (5) can perform any other work at

---

[87]     42 U.S.C. § 1382c(a)(3)(A).

[88]     42 U.S.C. § 1382c(a)(3)(B).

step five.[89]  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[90]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[91] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[92]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[93]

The claimant bears the burden of proof on the first four steps.[94]  At the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[95]  This burden may be

---

[89]    20 C.F.R. § 404.1520; see, e.g., *Wren v. Sullivan*, 925 F.2d at 125; *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 271-72 (5th Cir. 2002); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

[90]    *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[91]    20 C.F.R. § 404.1520(a)(4).

[92]    20 C.F.R. § 404.1545(a)(1).

[93]    20 C.F.R. § 404.1520(e).

[94]    *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[95]    *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[96]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[97]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[98]

## D.    THE ALJ'S FINDINGS AND CONCLUSIONS

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since May 1, 2009.[99]  This finding is supported by the evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:  a bipolar disorder and an anxiety disorder.[100]  This finding is supported by evidence in the record.

---

[96]     *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[97]     *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[98]     *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992), citing *Johnson v. Bowen*, 851 F.2d 748, 751 (5th Cir. 1988).  See, also, 20 C.F.R. § 404.1520(a)(4).

[99]     Rec. Doc. 7-1 at 20.

[100]     Rec. Doc. 7-1 at 20.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[101]  The claimant does not challenge this finding.

The ALJ found that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:  work requiring one, two, and three-step instructions and work requiring only occasional interaction with others.[102]  The claimant challenges this finding.

At step four, the ALJ found that the claimant is not capable of performing her past relevant work.[103]  The claimant does not challenge this finding.

At step five, the ALJ found that the claimant was not disabled from May 1, 2009 (the alleged disability onset date) through May 13, 2014 (the date of the decision) because there are jobs in the national economy that she can perform.[104]  The claimant challenges this finding.

---

[101]     Rec. Doc. 7-1 at 20.

[102]     Rec. Doc. 7-1 at 26.

[103]     Rec. Doc. 7-1 at 27.

[104]     Rec. Doc. 7-1 at 28-29.

E.   **THE CLAIMANT'S ALLEGATIONS OF ERROR**

The claimant argues that the ALJ erred (1) because he did not properly evaluate the opinions of the claimant's treating psychiatrist, Dr. Lindsey Legnon; (2) because he failed to apply controlling law in evaluating the April 2011 medical opinions of Dr. Cathy Castille; and (3) because he improperly evaluated the claimant's residual functional capacity.

F.   **THE ALJ FAILED TO PROPERLY EVALUATE DR. LEGNON'S OPINIONS**

The ALJ has the sole responsibility for determining the claimant's disability status;[105] therefore, a treating physician's opinions concerning a claimant's employability are not determinative.  However, the opinion of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be accorded great weight by the ALJ in determining disability.[106]  In fact, when a treating physician's opinion regarding the nature and severity of an impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the ALJ must

---

[105]     *Newton v. Apfel*, 209 F.3d at 455.

[106]     *Pineda v. Astrue*, 289 Fed. App'x 710, 712-713 (5th Cir. 2008), citing *Newton v. Apfel*, 209 F.3d at 455.

give that opinion controlling weight.[107]  If an ALJ declines to give controlling weight to a treating doctor's opinion, he may give the opinion little or no weight – but only after showing good cause for doing so.[108]  Good cause may be shown if the treating physician's opinion is conclusory, unsupported by medically acceptable clinical laboratory diagnostic techniques, or is otherwise unsupported by the evidence.[109] Before declining to give any weight to the opinions of a treating doctor, an ALJ must also consider the length of treatment by the physician, the frequency of his examination of the claimant, the nature and extent of the doctor-patient relationship, the support provided by other evidence, the consistency of the treating physician's opinion with the record, and the treating doctor's area of specialization, if any.[110]

In this case, Dr. Legnon is a psychiatrist who saw the claimant almost every month for four years.  The length and frequency of the doctor-patient relationship as well as Dr. Legnon's status as a specialist are factors that favor giving great weight to her opinions.

---

[107]    20 C.F.R. § 404.1527(c)(2).  See, also, *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).

[108]    *Thibodeaux v. Astrue*, 324 Fed. App'x 440, 443-44 (5th Cir. 2009).

[109]    *Thibodeaux v. Astrue*, 324 Fed. App'x at 443-44.

[110]    *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001); *Newton v. Apfel*, 209 F.3d at 456.

The Social Security regulations and rulings explain how medical opinions are to be weighed.[111]  Generally, the ALJ must evaluate all of the evidence in the case and determine the extent to which medical source opinions are supported by the record. Therefore, if Dr. Legnon's opinions are supported by substantial evidence in the record, they should also be accorded great weight – or even controlling weight.

In this case, however, the ALJ rejected Dr. Legnon's mental functional capacity assessment of September 11, 2013 and gave it no weight at all on the basis that Dr. Legnon's findings conflict with her treatment notes.[112]  The ALJ did not identify any of Dr. Legnon's treatment notes that conflict with the opinions set forth in the September 11, 2013 assessment.  The ALJ also failed to evaluate Dr. Legnon's letter of August 21, 2012.  The opinions set forth in that letter are consistent with those reached in the September 11, 2013 assessment, and the ALJ did not expressly reject the opinions set forth in that letter.  Most importantly, a review of the treatment notes spanning the entirety of Dr. Legnon's course of treatment from December 2009 through December 2013 shows that, despite numerous counseling sessions and the prescription of myriad medications, the claimant's symptoms did not vary much over the four-year treatment span.  The claimant remained easily overwhelmed, anxious,

---

[111]     20 C.F.R. § 404.1527(c), § 416.927(c), SSR 96-2p, SSR 96-5p.

[112]     Rec. Doc. 7-1 at 27.

depressed, obsessive-compulsive about cleanliness, and overly emotional, with a low stress tolerance and an inability to be comfortable around others.  In sum, despite the ALJ's contrary finding, Dr. Legnon's treatment notes actually are consistent with the opinions she expressed in the August 2012 letter and in the September 2013 mental functional capacity assessment.

Although the ALJ did not identify any treatment notes that conflict with Dr. Legnon's opinions, the Commissioner identified four in his brief.  First, the Commissioner directed attention to the treatment note from January 12, 2011, noting that the claimant was "doing well," that she was taking Trileptal that was "effective and without side effects," that Paxil had helped significantly with reducing social anxiety and obsessional cleaning, that her worry was reduced, that she was functioning at a higher level, and that she had begun exercising.  Focusing on this one positive treatment note out of the context of the overall four years of treatment ignores the fact that, just twelve days later, the claimant reported increased crying spells and increased feelings of being overwhelmed.  A month after that, the claimant reported an increase in anxiety.  A few months later, in July 2011, Dr. Legnon changed the diagnosis, and in August 2011 Dr. Legnon replaced Trileptal with Lamictol in an effort to control the claimant's symptoms.

The second example cited by the Commissioner of a treatment note that conflicts with Dr. Legnon's opinion is a continuity of care data form dated December 8, 2010.[113]  The Commissioner correctly noted that this form says the claimant was doing well despite several stressors.  However, the Commissioner did not cite to social worker Christy James's treatment note for that same day,[114] which indicates that Trileptal made the claimant dizzy, and that although her medications were helping with the symptoms of her obsessive-compulsive disorder she was still obsessively taking three showers per day.

The third example cited by the Commissioner of a conflicting treatment note is that of social worker Michelle Maloney regarding a counseling session on September 12, 2013.[115]  The Commissioner cited this treatment note because it indicates that the claimant was functioning "fairly well."  What the Commissioner failed to acknowledge is that this same treatment note also indicates that the claimant told the social worker that her anxiety was high and she could not wait in the mental health center's waiting area because of her great discomfort around people.  The Commissioner did not note that the claimant wept through much of the session, told

---

[113]    The Commissioner erroneously provided the date of December 6, 2010 for this form.

[114]    Rec. Doc. 7-1 at 417.

[115]    Rec. Doc. 7-1 at 490.

the social worker that she was feeling overwhelmed, told the social worker that she was still often tempted to spray people with Clorox although she was doing better with leaving situations before stepping over personal boundaries or confronting people, told the social worker that she continued to get depressed and cry, told the social worker that she had a difficult time not perserverating on the past and fears of the future, and told the social worker that she did not drive at night due to the combination of a vision problem and her fears.

The final treatment note cited by the Commissioner as inconsistent with Dr. Legnon's opinions is that of October 9, 2013,[116] in which the social worker noted that the claimant's generalized anxiety and obsessive-compulsive disorder were fairly well managed and her activities of daily living were ok as long as she could control her home environment.  The Commissioner failed to note that the claimant was also looking forward to a new dose of medication and was "feeling bad. . . like I could jump through the window."  The Commissioner also failed to mention Dr. Legnon's treatment note of the previous day,[117] in which she reported that the claimant presented with an irritable and depressed mood and a labile, tearful affect.  On that

---

[116]     Rec. Doc. 7-1 at 538.

[117]     Rec. Doc. 7-1 at 536.

-33-

day, the claimant told Dr. Legnon that her "mood changes like the wind," she continues to have difficulty tolerating other people, and she was still irritable.

On eight separate occasions in 2012 and 2013, Dr. Legnon expressly noted that the claimant's symptoms were marked in their severity.  Although her treatment notes do indicate short periods of some improvement in the claimant's symptoms, as illustrated by the treatment noted from January 2011 that the Commissioner primarily relied upon, the treatment notes also indicate that Dr. Legnon struggled to find an appropriate medication that would alleviate the claimant's depression, anxiety, and obsessive-compulsive behavior without causing intolerable side effects.   The treatment notes also demonstrate that, over the four-year span of treatment, little improvement was reached in helping the claimant to become comfortable with people other than her immediate family.  At the time of the second hearing, which was after the date of the last treatment note in the record, the claimant was still washing her hands twenty times per day and carrying Clorox in her purse.

Considering the evidence in the record as a whole, this Court concludes that the ALJ's conclusion that Dr. Legnon's opinions are inconsistent with her treatment notes is not supported by substantial evidence in the record.  The opinions set forth in Dr. Legnon's letter dated August 21, 2012 and those set forth in her mental functional capacity assessment dated September 11, 2013 are consistent with Dr.

-34-

Legnon's treatment notes.  In August 2012 and again in September 2013, Dr. Legnon described the claimant as unable to handle even small stressors, emotional, easily overwhelmed, and uncomfortable around people other than her immediate family.  Dr. Legnon explained on both occasions that neither medication nor counseling had been effective in improving the claimant's symptoms, which is evident from the record. In Dr. Legnon's opinion, the severity and persistence of the claimant's psychiatric symptoms impair her ability to maintain employment.  This Court finds that, because these opinions are supported by substantial evidence in the record, the ALJ erred in rejecting Dr. Legnon's opinions and in failing to give them either great weight or controlling weight.

## G.    THE ALJ FAILED TO PROPERLY EVALUATE DR. CASTILLE'S OPINIONS

The claimant's second alleged error centers on the ALJ's evaluation of the opinions of Dr. Cathy Castille, a non-examining state agency psychological consultant.  Shortly after the claimant applied for benefits, Dr. Castille opined that the claimant was markedly limited in her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest

periods.[118]   Dr. Castille found the claimant to be disabled.[119]   That decision was reviewed by Paula Kresser, Ph.D., who concluded that additional evidence was necessary to determine the claimant's functional limitations.[120]   Thereafter, Dr. Castille reevaluated the claimant – again without meeting or examining her – and opined that the claimant was moderately limited in the ability to complete a normal workday and workweek.

The Social Security regulations state that "[r]egardless of its source, we will evaluate every medical opinion we receive."[121]   Thus, the ALJ was required to consider both of Dr. Castille's opinions.  Additionally, when the Appeals Council remanded this matter for reconsideration, the Appeals Council expressly directed the ALJ to consider both of Dr. Castille's opinions.  The Appeals Council noted that the ALJ was not bound by Dr. Castille's opinions but stated that "the opinions provided by Dr. Castille. . . must be fully evaluated and the weight assessed those opinions must be noted."[122]

---

[118]   Rec. Doc. 7-1 at 95.

[119]   Rec. Doc. 7-1 at 80, 99.

[120]   Rec. Doc. 7-1 at 369.

[121]   20 C.F.R. § 404.1527.

[122]   Rec. Doc. 7-1 at 117.

In the second ruling, however, the ALJ expressly gave significant weight to Dr. Castille's July 2011 opinions but failed to even mention her earlier opinions. This is significant because Dr. Castille's April 2011 opinions are similar to those of Dr. Legnon, which as noted above are consistent with substantial evidence in the record. The ALJ, however, failed to even mention Dr. Castille's earlier opinions and expressly rejected Dr. Legnon's opinions while giving significant weight to Dr. Castille's July 2011 opinions, which are flanked chronologically by the medical opinions that were not accorded any weight.

An ALJ is required to consider all of the evidence in the record and cannot "pick and choose" only the evidence that supports his position.[123] Dr. Castille may have had valid reasons for changing her opinion between April and July of 2011, but it was error for the ALJ to rely upon one of her opinions without even mentioning the other, especially since there were other medical opinions in the record that were consistent with the opinions of Dr. Castille that the ALJ expressly rejected. The ALJ erred in failing to consider all of the medical opinions in the record, particularly including Dr. Castille's opinions of April 2011, and this error mandates reversal of the ALJ's decision.

---

[123]    *Loza v. Apfel*, 219 F.3d at 393.

## H.   THE ALJ FAILED TO PROPERLY EVALUATE THE CLAIMANT'S RESIDUAL FUNCTIONAL CAPACITY

The claimant's final argument is that the ALJ's residual functional capacity assessment does not account for all of her functional limitations.  More specifically, the claimant argues that the ALJ's finding regarding her residual functional capacity fails to account for her limitations in maintaining concentration, persistence, or pace as well as her limitations in social functioning, which were recognized by Dr. Legnon[124] and by Dr. Castille in her earlier evaluation.[125]

The responsibility for determining a claimant's residual functional capacity belongs to the ALJ.[126]  In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's ability despite any physical and mental limitations.[127]

In crafting his finding concerning the claimant's residual functional capacity, the ALJ rejected Dr. Legnon's September 11, 2012 opinions, gave significant weight to Dr. Castille's July 2011 opinions, and gave significant weight to the claimant's

---

[124]      Rec. Doc. 479, 481-482.

[125]      Rec. Doc. 93-95.

[126]      *Ripley v. Chater*, 67 F.3d at 557.

[127]      *Martinez v. Chater*, 64 F.3d at 176.

-38-

records from the Tyler Mental Health Center, particularly those from September 2013, which indicated that the claimant was functioning fairly well despite her mental health symptoms.  In a prior section of this ruling, it was demonstrated that the ALJ erred in rejecting Dr. Legnon's opinions, in failing to consider Dr. Castille's April 2011 opinions, and in relying heavily on the medical records from September 2013.

In evaluating the claimant's residual functional capacity, the ALJ gave significant weight to Dr. Castille's July 2011 opinions, citing in particular her opinion that the claimant was capable of getting along with others.  Dr. Castille's July 2011 opinion also noted that the claimant had no social interaction limitations.[128]  That conclusion is contrary to the evidence in the record.

In her initial work-up at Tyler Mental Health, the claimant denied social interaction, reporting that since the birth of her youngest child she had had no friends.[129]  On March 24, 2010, the claimant told her counselor that she did not want to be around people.[130]  On May 19, 2010, she reported snapping at people and worrying about people knowing her business or coming into her home to take her

---

[128]     Rec. Doc. 7-1 at 65.

[129]     Rec. Doc. 7-1 at 437.

[130]     Rec. Doc. 7-1 at 433.

medicine.[131]  On November 9, 2010, the claimant told Dr. Legnon that she did not want to be around people because of her anxiety.  In December 2010, the claimant was reluctant to seek certain services for her autistic son because it would require another person to come into her home.[132]  At the first hearing, she denied having any hobbies other than occasionally watching a House Hunters episode on television and denied doing anything socially through a church or any other organization.[133]  At the second hearing, the claimant discussed her lack of tolerance of other people, stating that she dislikes being around a lot of people and has such a dislike of smells that she sprays people with Clorox and sits by herself.[134]  She testified that when she takes her son to McDonald's, she sits off in the corner.[135]  She occasionally lets one or two of her neighbors into her house but has no friends or hobbies.[136]  This behavior was corroborated in the medical records, along with impulsive verbal outbursts regardless

---

[131]     Rec. Doc. 7-1 at 425.

[132]     Rec. Doc. 7-1 at 417.

[133]     Rec. Doc. 7-2 at 13-14.

[134]     Rec. Doc. 7-1 at 42, 52.

[135]     Rec. Doc. 7-1 at 47.

[136]     Rec. Doc. 7-1 at 48.

of how hurtful they might be to others.[137]  The record as a whole does not support a conclusion that the claimant has no limitations in the category of social interactions.

Accordingly, this Court finds that the ALJ's evaluation of the claimant's residual functional capacity failed to incorporate the claimant's limitations in social interactions that are documented in the record.  This was the result of the ALJ's errors in applying an improper legal standard and reaching a conclusion that was not supported by substantial evidence in the record.  These errors in evaluating the claimant's residual functional capacity mandate reversal of the Commissioner's ruling.

Having found that the ALJ failed to properly evaluate the claimant's residual functional capacity by failing to properly address her limitations in social interactions, this Court pretermits discussion of whether the ALJ also failed to properly evaluate how her limitations in maintaining concentration, persistence, or pace affect her residual functional capacity.

<u>CONCLUSION</u>

This Court finds that the ALJ failed to properly weigh the medical opinions in the record, particularly that of Dr. Legnon; failed to properly evaluate Dr. Castille's medical opinions, particularly those of April 2011; and failed to properly evaluate the

---

[137]     Rec. Doc. 7-1 at 452, 462, 464.

claimant's residual functional capacity.  When Dr. Legnon's opinions are given controlling weight, as they must be since they are supported by substantial evidence in the record, this Court concludes that the claimant is disabled.

Accordingly, IT IS ORDERED that the Commissioner's decision is REVERSED and remanded to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions that the claimant's applications for Disability Insurance Benefits and Supplemental Security Income be granted and for computation and payment of an award of benefits beginning on the alleged disability onset date, May 1, 2009.  Inasmuch as the reversal ordered herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[138]

Signed in Lafayette, Louisiana, this 8th day of August 2016.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[138]    See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir.1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

-42-